UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMETRI J. DANIELS                    )
                                      )
                  Plaintiff,          )
                                      )        Civil Action No. 07-0505 (RBW)
        v.                            )
                                      )
MICHAEL CHERTOFF, Secretary,          )
U.S. Department of Homeland Security  )
                                      )
                  Defendants.         )
_____)

## MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, Defendant,

Michael Chertoff, Secretary, U.S. Department of Homeland Security, through counsel,

respectfully moves this Court to dismiss *Pro Se* Plaintiff's complaint with prejudice or grant

summary judgment in favor of the Defendant for lack of subject matter jurisdiction and failure to

state a claim.  In support of this motion, Defendant respectfully refers the Court to the attached

memorandum of points and authorities.

*Pro Se* Plaintiff will please take note that the assertions contained in the accompanying

declarations and other attachments in support of Defendants motion may be accepted by the

Court as true unless Plaintiff submits his own affidavit or other documentary evidence

contradicting the assertions in Defendants' declaration and attachments.  See Neal v. Kelly, 963

FBIHQ.2d 453, 456 (D.C. Cir. 1992), and Local Rule 7.  Further, Fed. R. Civ. P. 56(e) provides

that:

> Supporting and opposing affidavits shall be made on personal
> knowledge, shall set forth such facts as would be admissible in
> evidence, and shall show affirmatively that the affiant is competent
> to testify to the matters stated therein.  Sworn or certified copies of
> all papers or parts thereof referred to in an affidavit shall be

attached thereto or served therewith.  The court may permit
affidavits to be supplemented or opposed by depositions, answers
to interrogatories, or further affidavits.  When a motion for
summary judgment is made and supported as provided in this rule,
an adverse party may not rest upon the mere allegations or denials
of the adverse party's pleading, but the adverse party's response,
by affidavits or as otherwise provided in this rule, must set forth
specific facts showing that there is a genuine issue for trial.  If the
adverse party does not so respond, summary judgment, if
appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

Because this is a dispositive motion, the undersigned has not sought Plaintiff's consent

before filing it.  LCvR 7 (m).

Dated: January 14, 2008                    Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney.


/s/
ANDREA McBARNETTE, D.C. Bar  # 483789
Assistant United States Attorney Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7153

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEMETRI J. DANIELS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-0505 (RBW) |
| v. | ) | |
| | ) | |
| MICHAEL CHERTOFF, Secretary, | ) | |
| U.S. Department of Homeland Security | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL
## FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rule 7.1(h), Defendant, Michael Chertoff, Secretary, U.S. Department of Homeland Security ("DHS"), respectfully submits this statement of material facts as to which he contends there is no genuine dispute.

1.  Plaintiff, Demetri J. Daniels is an African American male, and a former Supervisory Auditor for DHS's Office of Inspector General ("OIG"). Compl. ¶¶ 8, 9. The Plaintiff worked as an Equal Employment Opportunity ("EEO") Counselor. Compl. ¶¶ 10.

2.  On or about May 2003, Plaintiff was appointed to serve as the EEO counselor for Ms. Patsy Ervin, a FEMA OIG employee (FEMA was absorbed into DHS). Compl. ¶ 11. On May 21, 2003, Plaintiff sent an email to Gary Barard, then Director of the Atlanta field office, to inform him that he was the assigned EEO counselor for Ms. Ervin's complaint. Plaintiff proclaimed his impartiality as the EEO counselor. Compl. ¶ 16; Exhibit 1, Email May 21, 2003.

3.  Mr. Barard had supervised Plaintiff in the past and did not think Plaintiff could be objective in this particular matter. Mr. Barard stated that he had placed Plaintiff on a

Performance Improvement Plan ("PIP").  Compl. ¶¶ 16, 20;  Exhibit 1, Email May 21, 2003.

4.    On May 27, 2003, Richard Reback, Counsel to the Inspector General, after attempting to call and leaving a message with the Plaintiff, sent an e-mail to Plaintiff asking him to withdraw as Ms. Ervin's EEO counselor because Plaintiff had a prior working relationship with at least one person involved in the complaint, and that prior relationship created a conflict of interest as well as an appearance of a conflict.  Compl. ¶ 23; Exhibit 2, Email May 27, 2003.

5.    On May 28, 2003, Plaintiff alleges that he opened Mr. Reback's email, and took leave on the basis of an injury allegedly caused by reading the email.  Plaintiff claims that Mr. Reback's email triggered a relapse of his alleged post-traumatic stress disorder ("PTSD").  Compl. ¶¶ 22, 27.

6.    While on leave, by letter dated July 12, 2003, Plaintiff requested EEO counseling from the FEMA Office of Equal Rights because of his "concern" about being asked to withdraw as an EEO Counselor without being "consulted or given the opportunity to respond before this decision."  See Compl. ¶ 39; Exhibit 3, Letter of July 12, 2003.

7.    On June 4, 2003, Plaintiff filed a workers' compensation claim with the Department of Labor for the "injury" sustained after reading Mr. Reback's email.  See Compl. ¶ 37; Exhibit 4, Workers' Compensation Claim.  His claim was denied on October 1, 2003 for failure to show that DHS acted abusively or in error.  Exhibit 5, Letters of Denial from Department of Labor.  Plaintiff's request for reconsideration was denied on November 14, 2003, and again on December 8, 2003.

8.    Plaintiff claimed that he was unable to return to his office due to his PTSD.  Compl. ¶ 41;

2

Exhibit 6, Letter dated Sept. 24, 2003.  Defendant agreed to provide an alternate work location away from OIG Headquarters to lessen Plaintiff's perceived stress associated with working at OIG Headquarters.  As such, Plaintiff was to report to work at the National Press Building, 529 14th Street, NW, Suite 200, on October 28, 2003.  Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003.  Plaintiff did not report to work that day.  Id.; Exhibit 8, Leave request package dated Oct. 29, 2003.  Rather, he halted outside the building, claiming that he was unable to enter it because of his condition.  Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003.

9.    On November 12, 2003, Plaintiff reported to the alternate work site with his nurse, but stayed at the site for only two hours, claiming to be unable to even enter his email account because of his illness.  After that, his supervisor then offered to arrange for Plaintiff to perform work that would not require using a computer and he agreed to return to the National Press Building on November 17, 2003.  On November 17, 2003, Plaintiff again failed to report to the alternate work site as directed.  Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003

10.   In November 2003, Plaintiff was accepted into the Government's voluntary leave transfer program under 5 CFR Part 630, Subpart I, based on medical documentation.  Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts.  On November 14, 2003, Plaintiff contacted Shalonda Smith [now Lewis], an OIG personnel specialist.  Ms. Lewis received two voice mails from Plaintiff.  In the first message, at 2:13 pm, Plaintiff was having what sounded like a conversation between him and his wife and it was clear by the tone and substance of the message that the conversation was being recorded unbeknownst to him.  Letter of Nov. 21, 2003 with Voice Mail Transcripts Verizon Communications

3

transcribed the voice mail as follows [relevant portion]:

You know what, I'm going to get eight or more in [inaudible] following week. They're going to have—I'm going to have at least three or four pay periods in the bank. Unah, unah. And that's just this. If that goes through all the DHS and FEMA, which is going to take probably till the end of January or February, then go EEOC. [Laughs]

I'm going to all. Then I'll going to go to the Army, then I'm going BOP. I'm going to every last one, [inaudible].

Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts

11.    By letter dated November 21, 2003, to Plaintiff, the Defendant proposed to terminate his

participation in the voluntary leave transfer program because his voice mails caused OIG

to question whether Plaintiff continued to be affected by a medical emergency, as defined

in 5 C.F.R. § 630.902, and whether his continuation in the voluntary leave transfer

program was authorized. The letter included copies of the transcripts and the audio

recordings of the two voice mail messages left by Plaintiff on November 14, 2003.

Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts. By letter dated

December 1, 2003, to OIG, Plaintiff's counsel admitted that Plaintiff left both voice mail

messages. Exhibit 10, Letter of Dec. 1, 2003. On December 5, 2003, Plaintiff's counsel

agreed to provide additional medical information addressing specific concerns. Exhibit

11, Letter of Dec. 8, 2003 Documenting Agreement between OIG and Pl.'s Counsel.

12.    On December 17, 2003, Defendant received a summary report from Plaintiff's treating

psychiatrist, outlining accommodations that she believed were necessary for Plaintiff,

including working at home. Exhibit 12, Lewis Summary Medical Report of Dec. 15,

2003. By letter dated December 18, 2003, Defendant advised Plaintiff's counsel that Dr.

Lewis' report was insufficient and reiterated what medical documentation was necessary.

4

Also, Defendant advised of its intent to seek an independent medical examination and review of his medical records, and thus requested Plaintiff's consent for the release of his medical records. Exhibit 13, Letter of Dec. 18, 2003. On January 14, 2004, the Defendant sent a medical consent form to Plaintiff. Exhibit 14, Letter of Jan. 14, 2004.

13.    By letter dated February 9, 2004, Defendant terminated Plaintiff's participation in the leave transfer program due to his failure to provide adequate medical documentation as requested. Plaintiff's participation in the program was terminated as of January 25, 2004. Exhibit 15, Letter of Feb. 9, 2004. By letter dated February 10, 2004, Plaintiff's counsel asked that a specific doctor be identified to receive Plaintiff's medical records. Exhibit 16, Letter of Feb. 10, 2004. By letter dated February 11, 2004, Defendant forwarded a redrafted medical release form that designated Dr. Martin Allen, a board certified psychiatrist, to receive the records. Exhibit 17, Letter of Feb. 11, 2004. Plaintiff then signed the release form with Dr. Allen as the designated recipient.

14.    By report dated March 1, 2004, Dr. Allen provided Defendant with his review of Plaintiff's medical records, which included a discussion with Plaintiff's treating psychiatrist. Dr. Allen concluded that Plaintiff was suffering from a "moderately severe condition of Post Traumatic Stress Disorder, with both anxiety and depression" and that accommodations were clearly warranted. Dr. Allen recommended the following accommodations: 1) allow Plaintiff to work at home, initially part time; 2) provide assignments and instructions to Plaintiff in writing or by telephone, but not by email; 3) conduct weekly phone meetings with his supervisor, to assess performance and goals; 4) assign no new responsibilities and divide complex assignments into smaller tasks; 5) allow a trial period of one or two months for the accommodations, with a very gradual

transition back to full time employment.  Exhibit 18, Allen Medical Report of Mar. 1, 2004.

15.     Defendant questioned the reliability of Dr. Allen's review and noted that it did not address a number of troubling actions by Plaintiff, including but not limited to: his not returning his supervisor's phone calls; his failing to report his absences; his refusing to accept federal express packages; and his voice mail message in which he appears to indicate his desire to exploit the leave transfer program.  Dr. Allen and Plaintiff's doctor were not aware that the Plaintiff had not been returning phone calls and refusing mail. Exhibit 19, Emails of March 2, 2004.

16.     On March 8, 2004, Defendant proposed the removal of the Plaintiff.  Exhibit 20, Notice of Proposed Removal of Mar. 8, 2004.

17.     In or about May 2004, the Defendant allowed the Plaintiff to work from home part time and to be placed back into the leave transfer program.  See Compl. ¶ 63.

18.     Plaintiff's doctor advised the Plaintiff not to return to work effective February 22, 2005. Exhibit 21, Lewis Medical Excuse Note of Feb. 22, 2005.  The Plaintiff signed an application for disability retirement on February 24, 2005 and had his attorney forward the application to the Defendant.  Exhibit 22, Letter of Feb. 28, 2005.

19.     On March 7, 2005, Plaintiff's doctor confirmed that despite working from home, "accommodation has been unsuccessful" for the Plaintiff and that "[r]ecovery will be limited and maximum medical improvement cannot occur while Mr. Daniels remains on the job."  Exhibit 23, Lewis Medical Report of March 7, 2005, p. 2.  In addition, Plaintiff's job required Top Secret clearance and the Plaintiff never filled out the paperwork for the security clearance background investigation, despite repeated requests.

Exhibit 23, Letter of Nov. 16, 2004 from DHS Personnel Security Division Discontinuing

Efforts to Process Pl.'s Top Secret Security Clearance; Exhibit 25, Finn Security

Clearance Letter of Feb. 18, 2005.  On March 7, 2005, Plaintiff's doctor confirmed that

the Plaintiff was unable to fill out his paperwork for the required security clearance.

Exhibit 23, Lewis Medical Report of March 7, 2005, p. 2.


Dated: January 15, 2008               Respectfully submitted,


                                 /s/
                                JEFFREY A. TAYLOR, D.C. BAR # 498610
                                United States Attorney


                                 /s/
                                RUDOLPH CONTRERAS, D.C. BAR # 434122
                                Assistant United States Attorney.


                                 /s/
                                ANDREA McBARNETTE, D.C. Bar  # 483789
                                Assistant United States Attorney Center Building
                                555 Fourth Street, N.W.
                                Washington, D.C. 20530
                                (202) 514-7153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMETRI J. DANIELS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL CHERTOFF, Secretary, | ) |
| U.S. Department of Homeland Security | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 07-0505 (RBW)

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, Michael Chertoff, Secretary, U.S. Department of Homeland Security, through counsel, respectfully moves this Court to dismiss *Pro Se*[1] Plaintiff's complaint with prejudice or grant summary judgment in favor of the Defendant for lack of subject matter jurisdiction and failure to state a claim. In this employment discrimination action, Plaintiff asserts claims of disability under the Rehabilitation Act of 1973 and retaliation and hostile work environment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.. The Court should dismiss Plaintiff's claims because he failed to exhaust his administrative remedies and failed to state actionable claims. In the alternative, the Court should grant summary judgment as the Plaintiff cannot demonstrate that the Defendant's reasons for the actions at issue are a pretext for discrimination.

---

[1]     Pro se Plaintiff is not an attorney but is a registered seller of Legal Service Plans in Virginia. http://www.virginiainteractive.org/vdacs/cgi-bin/lsp_public.cgi?lname_search=D

## **INTRODUCTION**

The Plaintiff alleges that the Defendant retaliated against him for acting as an EEO Counselor. Compl. ¶ 1. When Defendant discovered that the Plaintiff was acting as an EEO counselor in a matter in which the alleged discriminating official said that he had years earlier placed the Plaintiff on a Performance Improvement Plan ("PIP"), the Defendant asked the Plaintiff to withdraw as the EEO counselor for that case. Exhibit 2, Email May 27, 2003. The Plaintiff claims that as a result of reading an email asking him to withdraw as counselor, he suffered a reoccurrence of his Post Traumatic Stress Disorder ("PTSD"). Compl. ¶¶ 22-23, 27.

Thereafter, Plaintiff never returned to his office and did not return to do actual work at the alternative worksite meant to accommodate him. Exhibit 26, Supervisor's Statement for Disability Retirement Packet, pp. 3-5. When Plaintiff failed to call his supervisors regarding his absences, rejected mail, left inadvertently a voice mail message suggesting that he was abusing the leave transfer program, and failed to provide sufficient medical information regarding his condition, the Defendant proposed his termination and removed him from the leave transfer program. Exhibit 20, Notice of Proposed Removal of Mar. 8, 2004. Ultimately, the Defendant allowed the Plaintiff to work from home and returned him to the leave transfer program. However, the work-at-home accommodation failed and Plaintiff's own doctor advised that the Plaintiff discontinue work. Exhibit 23, Lewis Medical Report of Mar. 7, 2005. Plaintiff then immediately submitted his disability retirement application and retired soon after. Exhibit 27, Approval of Disability Retirement Application dated Apr. 13, 2005.

## **BACKGROUND**

Plaintiff, Demetri J. Daniels (a.k.a. James Daniels) is a former auditor with DHS's Office of Inspector General ("OIG") who took disability retirement in April 2005.

On or about May 2003, Plaintiff was appointed to serve as the EEO counselor for Ms. Patsy Ervin, a FEMA OIG employee (FEMA was absorbed into DHS) stationed in the Atlanta Field Office. Compl. ¶ 11. Plaintiff's former supervisor, Gary Barard, was an alleged discriminating official in that case. Compl. ¶ 18. On May 21, 2003, Plaintiff sent an email to Gary Barard, then Director of the Atlanta field office proclaiming his impartiality as the EEO counselor but Mr. Barard had supervised Plaintiff in the past and did not think Plaintiff could be objective. Exhibit 1, Emails May 21, 2003. Mr. Barard sent an email to Plaintiff's current supervisor, questioning Plaintiff's objectivity as the counselor considering that while he was Plaintiff's supervisor he had "put him on a Performance Improvement Plan (PIP)." Exhibit 1, Email May 21, 2003. Consequently, Richard Reback, Counsel to the Inspector General on May 27, 2003 first attempted to speak with the Plaintiff via phone, left a voice mail message and then sent an e-mail to Plaintiff asking him to withdraw as Ms. Ervin's EEO counselor because Plaintiff had a prior working relationship with at least one person involved in the complaint, and that prior relationship created a conflict of interest as well as an appearance of a conflict. Exhibit 1, Email May 21, 2003.

The next day, Plaintiff allegedly opened Mr. Reback's email. Compl. ¶¶ 22-23. Without responding to it, Plaintiff took leave on the basis of an injury allegedly caused by reading the email. Compl. ¶ 27. Later, Plaintiff explained that reading Mr. Reback's email had triggered a relapse of his alleged post-traumatic stress disorder ("PTSD"). Compl. ¶ 27. Plaintiff claimed that years ago he suffered a false arrest for shoplifting and that he was traumatized by the false arrest. Compl. ¶¶ 29-30. Plaintiff then claimed that Mr. Reback's email had triggered a similar

traumatic response. Compl. ¶ 31. Plaintiff never returned to full-time work after the incident of May 28, 2003 and never returned to work at his office. Exhibit 26, Supervisor's Statement for Disability Retirement Packet, pp. 3-5.

On July 12, 2003, Plaintiff requested EEO counseling because of his "concern" about being asked to withdraw as an EEO Counselor without being "consulted or given the opportunity to respond before this decision." Exhibit 3, Letter of July 12, 2003. On June 4, 2003, Plaintiff filed a workers' compensation claim with the Department of Labor for the "injury" sustained after reading Mr. Reback's email. His claim was denied on October 1, 2003 for failure to show that DHS acted abusively or in error. Exhibit 5, Letters of Denial from Department of Labor. Plaintiff's request for reconsideration was denied on November 14, 2003, and again on December 8, 2003.

In order to return Plaintiff to full time work, and in an effort to fully accommodate his claimed mental disability, Defendant agreed to provide an alternate work location away from OIG Headquarters to lessen Plaintiff's perceived stress associated with working at OIG Headquarters. As such, Plaintiff was to report to work at the National Press Building, 529 14th Street, NW, Suite 200, on October 28, 2003. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003. Plaintiff did not report to work that day. Rather, he halted outside the building, claiming that he was unable to enter it because of his condition. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003; Exhibit 8, Leave request package dated Oct. 29, 2003. On November 12, 2003, Plaintiff reported to the alternate work site with his nurse, but stayed at the site for only two hours, claiming to be unable to even enter his email account because of his illness. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003. After that, his supervisor then offered to arrange for Plaintiff to perform work that would not require using a computer and he agreed to return to the National Press Building on November 17, 2003. On November 17, 2003, Plaintiff

again failed to report to the alternate work site as directed.  Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003.

On November 3, 2003, Plaintiff was accepted into the Government's voluntary leave transfer program under 5 CFR Part 630, Subpart I, based on medical documentation.  On November 14, 2003, Plaintiff contacted Shalonda Smith [now Lewis], an OIG personnel specialist.  Ms. Lewis received two voice mails from Plaintiff.  In the first message, Plaintiff was having what sounded like a conversation between him and his wife and it was clear by the tone and substance of the message that the conversation was being recorded unbeknownst to him. The Plaintiff appeared to be laughing and indicating his exploitation of the leave transfer program and his PTSD.  In the second voice mail which was four minutes later, the Plaintiff left a message in a professional.  Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts.

By letter dated November 21, 2003, the Defendant proposed to terminate Plaintiff's participation in the voluntary leave transfer program because his voice mails caused Defendant to question whether Plaintiff continued to be affected by a medical emergency, as defined in 5 C.F.R. § 630.902, and whether his continuation in the voluntary leave transfer program was authorized.  The letter included copies of the transcripts and the audio recordings of the two voice mail messages.  Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts.  By letter dated December 1, 2003, Plaintiff's counsel admitted that Plaintiff left both voice mail messages. Exhibit 10, Letter of Dec. 1, 2003.  Plaintiff's attorney agreed to provide specific medical documentation regarding Plaintiff's condition in a meeting with Defendant on December 5, 2003.  Exhibit 11, Letter of Dec. 8, 2003 Documenting Agreement between OIG and Pl.'s Counsel.

On December 17, 2003, Defendant received a summary report from Dr. Lewis, Plaintiff's treating psychiatrist, outlining accommodations that she believed were necessary for Plaintiff,

including working at home.  Exhibit 12, Lewis Summary Medical Report of Dec. 15, 2003.  By

letter dated December 18, 2003, Defendant advised Plaintiff's counsel that Dr. Lewis' report was

insufficient and reiterated what medical documentation was necessary.  Also, Defendant advised

of its intent to seek an independent medical examination and review of his medical records.

Exhibit 13, Letter of Dec. 18, 2003.

      Because Dr. Lewis' December 15, 2003 summary report did not document any reason

that Plaintiff was not able to work at an alternate work site, Defendant directed Plaintiff to report

to work on January 26, 2004, at the National Press Building and that failure to report without

calling with an acceptable explanation would result in a charge of Absence Without Leave

("AWOL").  Additionally, Defendant provided information on how to invoke the Family and

Medical Leave Act  ("FMLA") for time off, if Plaintiff believed that it applied to his situation.

Exhibit 14, Letter of Jan. 14, 2004.  Plaintiff did not report to work on January 26, 2004, nor did

he contact Defendant with an explanation for his absence.[2]  Exhibit 20, Notice of Proposed

Removal of March 8, 2004.

      By letter dated February 9, 2004, Defendant terminated Plaintiff's participation in the

leave transfer program due to his failure to provide adequate medical documentation as

requested.  Plaintiff's participation in the program was terminated as of January 25, 2004.

Exhibit 20, Notice of Proposed Removal of March 8, 2004.  By letter dated February 10, 2004,

Plaintiff's counsel asked that a specific doctor be identified to receive Plaintiff's medical

records.  Exhibit 16, Letter of Feb. 10, 2004.  By letter dated February 11, 2004, Defendant

---

     [2]     Though Plaintiff had still not reported back to work in February 2004, according
to Todd Zelnick, one of Plaintiff' coworkers, Plaintiff had started a marriage counseling business
while on extended sick leave.  By email dated February 4, 2004, to Martha Barksdale (their
supervisor), Mr. Zelnick requested permission to engage in the outside activity of helping
Plaintiff with his new business.  Exhibit 28, Zelnick Email of Feb. 4, 2004.

forwarded a redrafted medical release form that designated Dr. Martin Allen, a board certified psychiatrist, to receive the records.  Exhibit 17, Letter of Feb. 11, 2004.  Plaintiff then signed the release form with Dr. Allen as the designated recipient.

On March 1, 2004, Dr. Allen provided Defendant with his review of Plaintiff's medical records, which included discussions with Plaintiff's treating psychiatrist.  Dr. Allen concluded that Plaintiff was suffering from a "moderately severe condition of Post Traumatic Stress Disorder, with both anxiety and depression" and that accommodations were clearly warranted. Dr. Allen recommended the following accommodations:  1) allow Plaintiff to work at home, initially part time; 2) provide assignments and instructions to Plaintiff in writing or by telephone, but not by email; 3) conduct weekly phone meetings with his supervisor, to assess performance and goals; 4) assign no new responsibilities and divide complex assignments into smaller tasks; 5) allow a trial period of one or two months for the accommodations, with a very gradual transition back to full time employment.  Exhibit 18, Allen Medical Report of March 1, 2004.

Defendant questioned the reliability of Dr. Allen's review and noted that it did not address a number of troubling actions by Plaintiff, including but not limited to:  his not returning his supervisors phone calls; his failing to report his absences; his refusing to accept federal express packages; and his voice mail message in which he appears to indicate his desire to exploit the leave transfer program.  Exhibit 19, Emails of March 2, 2004.  Also, Dr. Allen and the Plaintiff's doctor were not aware that Plaintiff was not cooperating with the Defendant by not returning phone calls from his supervisor and refusing packages.  Exhibit 19, Emails of March 2, 2004.

On March 8, 2004, Defendant proposed Plaintiff's removal from Federal service.  The proposal details Defendant's efforts to accommodate Plaintiff's claimed disability by arranging alternate worksites; his failure to work for more than a few hours since June 2003; his failure to

respond to inquiries from his supervisor and his failure to provide medical documentation justifying his absences.  Exhibit 20, Notice of Proposed Removal of March 8, 2004.

In May 2004, the Defendant allowed the Plaintiff to work part time from home and to be returned to the leave transfer program.[3] Compl. ¶ 63.

On November 17, 2004, Plaintiff filed a third workers' compensation claim, alleging a new injury that triggered his PTSD, that resulted from reading a statement made by his own attorney during EEO counseling on November 12, 2004.  Exhibit 29, Third Workers' Compensation Claim.  Plaintiff claimed that reading the statement "(1) interrupted [his] work-at-home accommodation and (2) delayed [his] progress to update and complete [his] security clearance by November 18, 2004."  Exhibit 29, Third Workers' Compensation Claim.  On January 21, 2005, this claim was denied because "an employee's emotional reaction to an administrative or personnel matter is not covered under FECA."  Exhibit 5, Letters of Denial from Department of Labor.

By letter dated February 18, 2005, Belinda Finn, the Deputy Assistant Inspector General for Audits, again reminded Plaintiff to complete his security clearance forms.  All positions within OIG require at least a Secret clearance and Plaintiff's position required a Top Secret clearance.  Ms. Finn advised that failure to complete the security clearance paperwork by March

---

[3]        Just as it appeared that Plaintiff was making efforts to return to work, he alleged that on June 28, 2004, security clearance forms concerning him were inappropriately sent by someone in the Federal government to a Kinko's store in Waldorf, MD.  Plaintiff was not working that day, but after retrieving the documents from Kinko's he claims to have suffered an "acute aggravation" of his PTSD as a result of the incident.  Plaintiff's claims were not substantiated by the Defendant because Plaintiff never provided concrete information about the claimed events, even though Defendant requested specific information about the incident on multiple occasions.  On July 27, 2004, Plaintiff filed a workmen's compensation claim for a new "injury" sustained as a result of the incident.  Exhibit 30, Second Workers' Compensation Claim.  On Oct. 7, 2004, his claim was denied because the evidence did not establish that he was injured in the performance of duty, as required by the FECA.  Exhibit 5, Letters of Denial from Department of Labor.

4, 2005 could result in disciplinary action, up to and including removal because all OIG

positions required at least a Secret clearance. Exhibit 25, Finn Security Clearance Letter of Feb.

18, 2005. On February 24, 2005, Plaintiff filed a fourth workers' compensation claim, alleging

that he suffered an aggravation of his condition when he received Ms. Finn's letter concerning

his security clearance. He alleged that the letter should have been sent to his attorney to avoid

aggravating his condition. On May 10, 2005, that claim was also denied because the evidence

was not sufficient to establish that he sustained an injury as defined by the FECA. Exhibit 31,

Denial Letter of May 10, 2005.

Plaintiff's doctor advised the Plaintiff not to return to work effective February 22, 2005.

Exhibit 21, Lewis Medical Excuse Note of Feb. 22, 2005. The Plaintiff signed an application for

disability retirement on February 24, 2005 and had his attorney forward the application to the

Defendant. Exhibit 22, Letter of Feb. 28, 2005.

On March 7, 2005, Plaintiff's doctor confirmed that despite working from home,

"accommodation has been unsuccessful" for the Plaintiff and that "[r]ecovery will be limited and

maximum medical improvement cannot occur while Plaintiff remains on the job." Exhibit 23,

Lewis Medical Report of March 7, 2005, p. 2. In addition, Plaintiff's doctor confirmed that the

Plaintiff was unable to fill out his paperwork for the required security clearance. Id.

On April 25, 2005, Plaintiff's counsel notified Defendant that the Office of Personnel

Management had approved Plaintiff's request for a disability retirement and asked that the

separation date be April 30, 2005. Exhibit 32, Letter of Apr. 25, 2005. Plaintiff retired on April

30, 2005.[4]

---

[4]    As a final outstanding matter, Daniels elected continuation of pay during each of
his pending workers' compensation claims and because all the claims were denied, he became
indebted to the United States for $31,466.33. As a result, Plaintiff filed four separate requests
for waiver of the indebtedness, two of which were denied by the Secretary on May 19, 2005

## STANDARD OF REVIEW

A.    *Motion to Dismiss*

In resolving Fed. R. Civ. P.  12(b)(6) motions to dismiss, the court will treat

the complaint's factual allegations as true and draw all reasonable inferences therefrom in the

plaintiff's favor.  Sullivan-Obst v. Powell, Secretary, Department of State, 300 F. Supp. 2d 85,

91 (D.D.C. 2004); Arbitraje Casa De Cambio v. United States Postal Serv., 297 F. Supp. 2d 165,

168 (D.C. C. 2003) (finding that substantially the same standard of review should be used to

evaluate Fed. R. Civ. P. 12(b)(1) and 12(b)(6) motions).

A complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon

which relief can be granted if it does not plead "enough facts to state a claim to relief that is

plausible on its face."  Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1974

(2007).  To survive a motion to dismiss, the factual allegations in the complaint "must be enough

to raise a right to relief above the speculative level."  Id. at 1965.  While "many well-pleaded

complaints are conclusory, the court need not accept as true inferences unsupported by facts set

out in the complaint or legal conclusions cast as factual allegations."  Shirk v. Garrow, 505 F.

Supp.2d 169, 172 (D.D.C. 2007).

The court may consider certain additional evidence in deciding the motion.  See, e.g.,

Marshall Cty. Health Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993); Hohri v. United

States, 782 F.2d 227, 241 (D.C. Cir. 1986); Scott v. England, 264 F. Supp. 2d 5, 7 (D.D.C. 2002)

(citing Hohri); Green v. Small, No. 05-1055, 2006 WL 148740, *6, n. 4 (D.D.C. Jan. 19, 2006)

(""Because documents involved in the administrative proceeding underlying this case are matters

---

(total $15,367.51).  The last two waiver requests are still pending the Secretary's approval or
disapproval (total $15,828.82).

of public record, the Court's consideration of them here does not convert defendant's motion for dismissal into a motion for summary judgment.").

B.    *Summary Judgment*

In the alternative, summary judgment pursuant to Fed. R. Civ. P. 56 is proper when the pleadings, depositions, answers to interrogatories, and admissions together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must consider whether the nonmoving party failed to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Sullivan-Obst, 300 F. Supp. 2d at 90. The nonmoving party must present specific facts that would enable a reasonable jury to find in its favor; thus, by pointing to an absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. Id. Also, while the court must accept the nonmoving party's evidence as true, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id. Therefore, an employer can obtain summary judgment in one of two ways: It can demonstrate that the plaintiff's evidence fails to establish a prima facie case or it can present a legitimate, nondiscriminatory reason about which the plaintiff does not create a valid factual dispute. Mitchell v. Data Gen. Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, [the Rule 56] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." Spiegel v. Leavitt, 2005 WL 2402322, at 8 (D.D.C. Sept. 22, 2005) (citation omitted).

## ARGUMENT

I.    **Plaintiff failed to exhaust his administrative remedies with regard to his constructive discharge claim.**

Any person alleging discrimination on the basis of disability must follow the procedural requirements in Title VII of the Civil Rights Act of 1964.  42 U.S.C.A. § 12117(a).  Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir. 2003).  Federal employees may only file a civil action after exhausting their administrative remedies before the concerned federal agency.  42 U.S.C. § 2000e-16(c).  Under rulemaking authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission."  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  The EEOC's regulations provide that "aggrieved" employees or applicants for employment who allege they have been discriminated against must first consult an agency EEO counselor before filing a complaint of discrimination and must do so within 45 days of the "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).   Timely compliance with these procedures is mandatory.  "Complainants *must* timely exhaust these administrative remedies before bringing their claims to court."  See  Bowden, 106 F.3d at 437; Battle v. Rubin, 121 F. Supp. 2d 4, 7 (D.D.C. 2000) ("a party must timely file all applicable administrative complaints and appeals in order to bring a claim in federal court"); Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII action"); Thorne v. Cavazos, 744 F. Supp. 348, 350-51 (D.D.C. 1990) (dismissing claims for failure to provide appropriate notice under ADEA).  As the U.S. Supreme Court reiterated in National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002), "'strict adherence to

the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [quoting Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)].'"

Plaintiff alleges that he was discriminated against on the basis of his disability when he was coerced into taking disability retirement and was constructively discharged. Compl. ¶ 67. Plaintiff did not seek EEO counseling nor did he file an EEO complaint alleging discriminatory constructive discharge. Plaintiff's constructive discharge claim should be dismissed.

## II. Hostile work environment claim fails

A work environment is considered "hostile" under Title VII only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). To determine whether a work environment is sufficiently "hostile" to support a Title VII claim, the Court must look at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. Boca Raton, 524 U.S. 775, 788 (1998)(emphasis added). "[O]ffhand comments[ ] and isolated incidents (unless extremely serious)" do not meet this standard. Id. [N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2003). These standards are "sufficiently demanding to ensure that Title VII does not become a general civility code." Faragher, 524 U.S. at 788 (quoting Oncale, 523 U.S. at 80). Moreover, Title VII "does not prohibit all forms of workplace harassment," but only harassment based on a person's membership in a class protected by Title VII. Stewart, 275 F.3d at 1133.

13

In the complaint, the Plaintiff failed to identify any alleged harassing conduct and therefore does not set forth a prima facie case of hostile work environment.  In fact, the Plaintiff was absent from the office place from roughly May 23, 2003 until he retired and therefore was not present to encounter an alleged hostile work environment at the office.  Exhibit 26, Supervisor's Statement for Disability Retirement Packet, pp. 3-5.  While there is no per se rule against "considering incidents alleged to have occurred while an employee was physically absent from the workplace," here the Plaintiff does not allege any harassment or hostile incident via telephone or mail.  Greer v.  Paulson, 505 F.3d 1306, 1314 (D.C. Cir. 2007).

To the extent that the Plaintiff suggests that the Defendant's request for medical documentation created a hostile work environment, such a claim fails.  See Allen v. Pac. Bell, 348 F.3d 1113, 1115 (9th Cir. 2003) (holding that if the employer requests reasonable medical evidence to support an employee's alleged medical condition, the employer is under no obligation to engage in further interactive processes if the employee fails to submit such evidence).  The Defendant requested reasonable medical evidence to support Plaintiff's alleged disability and was under no obligation to accommodate him without such medical evidence.  Exhibit 11, Letter of Dec. 8, 2003 Documenting Agreement between OIG and Pl.'s Counsel; Exhibit 14, Letter of Jan. 14, 2004.  Therefore, the Court should dismiss Plaintiff's claims of hostile work environment.

III.    **Plaintiff's retaliation claims fail**

A.    **Allocation of burdens of production and persuasion**

Under Burlington Northern v. Santa Fe Ry. Co. V. White, 126 S.Ct. 2405, 2410-16

(2006) the test for whether a prima facie case of retaliation has been shown is: (1) that a plaintiff

engaged in protected conduct, such as filing EEO charges; (2) that a reasonable employee would

have found the challenged retaliatory action materially adverse, "which in this context means it

well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination;" and (3) that a causal connection existed between the adverse action and the

protected activity.  Id.

"The familiar McDonnell Douglas framework governs its application for discrimination

and retaliation claims."  Vickers v. Powell, 493 F.3d 186, 194 (D.C. Cir. 2007); see, e.g.,

Chappell-Johnson v. Powell, 440 F.3d 484 (D.C. Cir. 2006); McKenna v. Weinberger, 729 F.2d

783, 790 (D.C. Cir. 1984).  Under this test, the plaintiff has the initial burden of proving by a

preponderance of the evidence a "*prima facie*" case of discrimination or retaliation.  Texas Dep't

of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If the plaintiff is able to

establish a *prima facie* case, the burden of production shifts to the defendant to produce credible

evidence that its actions were taken for a legitimate, nondiscriminatory reason.  Id.  Once it is

established that both parties have met their burden of production, the burden shifting scheme

becomes irrelevant and plaintiff must establish, by a preponderance of the evidence, that

discrimination or retaliation was a motivating factor for any employment practice.  See Desert

Place, Inc. v .Costa, 539 U.S. 90, 101 (2003).  Of course, "the ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all

times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).

B.    **EEO counseling activity**

### 1.    Plaintiff's EEO counseling activity is not a protected activity

Title 42 U.S.C. §2000e-3(a) provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Under this provision, a plaintiff may bring a "'participation claim,' i.e., plaintiff participated in EEO activity and then experienced harassment or retaliation, or an 'opposition claim,' i.e., plaintiff opposed an unlawful employment practice that others experienced and then suffered certain actionable consequences." Matta v. Snow, No. 02-862, 2005 WL 3454334, at *23 (D.D.C. 2005). Here, the Plaintiff claims that the agency retaliated against him before he even contacted an EEO counselor or filed a EEO complaint. See Compl., ¶¶ 19, 39; Exhibit 3, Letter of July 12, 2003. Therefore, any participation claim fails for allegations that pre-date Plaintiff's EEO contact.

The Plaintiff suggests that the Defendant retaliated against him for his role as an EEO counselor by asking him to withdraw from a case in which he had a conflict of interest. Compl. ¶ 1. To the extent that Plaintiff seeks to show that the Defendant allegedly retaliated against him due to the manner in which he performed his EEO Counselor duties, his "opposition claim,"[5] Plaintiff fails to state a prima facie claim. First, standing alone, the role of an EEO counselor does not constitute protected activity. See Pendleton v. Rumsfeld, 628 F.2d 102, 108-109 (D.C. Cir. 1980) (contemplating that the activities of an EEO Counselor do not necessarily constitute "protected activity" or oppositional activity); Matta, 2005 WL 3454334 (finding that the activities of an EEO Counselor did not constitute "protected activity" or oppositional activity).

_____

[5] See Matta, 2005 WL 3454334, *24, (finding that claims based on the manner in which the Plaintiff performed his EEO counselor duties constituted an "opposition claim.")

Second, as an EEO counselor, Plaintiffs role was limited to: advising the aggrieved person about the EEO complaint process; determining the claims and bases raised by the potential complaint; conducting a limited inquiry for the purposes of determining jurisdictional questions; seeking a resolution of the dispute at the lowest possible level; preparing a report sufficient to document that the EEO Counselor undertook the required counseling actions and to resolve any jurisdictional questions that arise.  EEOC's Management Directive ("MD") 110. The purpose of the limited inquiry is to obtain information to determine jurisdictional questions if a formal complaint is filed ... the inquiry is limited and not intended to substitute for the fact finding required in the formal stage.  The EEO counselor's role is to facilitate resolution, not develop or advocate specific terms of an agreement.  The EEO counselor must be careful not to inject his/her views on settlement negotiations.  MD-110 (excerpts from chapter 2, part VI).

In <u>Matta</u>, the Court found that the plaintiff, an EEO counselor who was an impartial fact finder and did not file complaints or make determinations, could not "rely upon his position as an EEO Counselor alone to provide the *prima facie* basis for his opposition claim." <u>Matta</u>, 2005 WL 3454334, *25.  Similarly, here the Plaintiff's duties required that he be impartial and not file complaints on behalf of employees or make determinations.  MD-110 (excerpts from chapter 2, part VI).  Therefore, the Court should dismiss any claim of retaliation based merely on Plaintiff's role as an EEO counselor.

### 2.      Request to withdraw was not a materially adverse action

Moreover, Defendant's request that the Plaintiff withdraw as EEO counselor was not a materially adverse employment action.  Exhibit 2, Email May 27, 2003.  Materially adverse " in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"  <u>Burlington</u>, 125 S.Ct. at 2415.  No reasonable employee would have found such a request materially adverse given the appearance of a conflict of interest.  No

reasonable employee would have felt dissuaded from "making or supporting a charge of discrimination."  See Burlington Northern, 125 S.Ct. at 2415.  Therefore, the Court should dismiss any claim of retaliation based merely on Plaintiff's role as an EEO counselor because there was no materially adverse action taken.[6]

### 3.    Concern regarding Plaintiff's conflict of interest in particular matter

Even assuming *arguendo* that Plaintiff was somehow actively "opposing" unlawful discrimination during his tenure with the Defendant, Plaintiff clearly cannot present sufficient evidence to rebut Defendant's legitimate concerns about his neutrality.  His former supervisor understandably had concerns about Plaintiff's position as an EEO counselor on a case in which the former supervisor was an alleged discriminating official.  Exhibit 1, Email May 21, 2003.  It was simply inappropriate for Plaintiff to be an EEO counselor in a case alleging misconduct of the very supervisor that had earlier given the Plaintiff a PIP and had found his performance as an auditor "unacceptable."  Compl., ¶ 20(b); Exhibit 1, Email May 21, 2003.  The danger of a conflict of interest was too great and entirely unnecessary as it could easily be avoided by the Plaintiff withdrawing from that case.

The email to which the Plaintiff took offense, requesting his withdrawal as EEO counselor, expressed a legitimate concern and was in accordance with good business practice. See Pendleton, 628 F.2d at 108 (rejecting retaliation claim of two EEO Counselors for participating in on-the-job demonstration because such conduct suggested that they had "fatally compromised their ability to gain the confidence of middle management, as spelled out in the Handbook, and that they were lacking in ability to appreciate management's point of view or see the facts as management saw them.... The decision to remove any employee must be made

---

[6]    As the Plaintiff was not ordered to withdraw, it is questionable whether, in fact, an employment action was even taken.  See Exhibit 2, Email May 27, 2003.

primarily in light of that employee's duties. A question of retaliation is not raised by a removal for conduct inconsistent with those duties, unless its use as a mere pretext is clear."); see also, B.T. Jones v. Flagship Int'l, 793 F.2d 714, 729 (5th Cir. 1986) (upholding dismissal, even if plaintiff acted with "sincere opposition to unlawful employment practices under Title VII," because plaintiff's activities "rendered [her] ineffective in the position for which she was employed," wherein she "played a crucial role in equal employment matters involving the company"). Therefore, the Court should grant summary judgment in favor of the Defendant.

### C.    Removal from Leave Donor Program

Plaintiff argues that the Defendant deliberately created a leave deficit by removing him from the leave transfer program on January 25, 2004 and charging him with AWOL. Compl. ¶ 60. But Defendant terminated Plaintiff's participation in the voluntary leave transfer program because he failed to provide sufficient medical documentation and to support his alleged medical condition. Exhibit 11, Letter of Dec. 8, 2003 Documenting Agreement between OIG and Pl.'s Counsel; Exhibit 14, Letter of Jan. 14, 2004. This documentation was legitimately requested because Plaintiff left two voice mails that caused the Defendant to doubt whether he continued to be affected by a medical emergency, as defined in 5 C.F.R. § 630.902, and whether his continuation in the voluntary leave transfer program was authorized. Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts.

On November 3, 2003, Plaintiff was accepted into the Government's voluntary leave transfer program under 5 CFR Part 630, Subpart I, based on medical documentation. On November 14, 2003, Plaintiff contacted an Office of Inspector General ("OIG") personnel specialist, Shalonda Smith [now Lewis], to discuss procedures for circulating his name so that he could solicit donated leave agency-wide. Ms. Lewis received two voice mails from Plaintiff. Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts. In the first message, at 2:13 pm,

Plaintiff was having what sounded like a conversation between him and his wife and it was clear by the tone and substance of the message that the conversation was being recorded unbeknownst to him.

> Verizon Communications transcribed the voice mail as follows [relevant portion]:
> You know what, I'm going to get eight or more in [inaudible]
> following week.  They're going to have—I'm going to have at
> least three or four pay periods in the bank.  Unah, unah.  And
> that's just this.  If that goes through all the DHS and FEMA,
> which is going to take probably till the end of January or
> February, then go EEOC.  [Laughs]
>
> I'm going to all.  Then I'll going to go to the Army, then I'm going
> BOP.  I'm going to every last one, [inaudible].

Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts.  Four minutes later, Plaintiff left a second message for Ms. Lewis in a professional tone, relaying certain contact information related to the circulation of his leave request throughout FEMA.  Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts.

The Defendant sent copies of the transcripts and the audio recordings of the two voice mail messages to the Plaintiff and by letter dated December 1, 2003, Plaintiff's counsel admitted that Plaintiff left both voice mail messages.  Exhibit 10, Letter of Dec. 1, 2003.  Plaintiff's counsel's letter.  Plaintiff's first voice mail message suggests that the Plaintiff's actions were premeditated and that he was attempting to exploit the leave program and several federal benefit programs.

Based on the suspicion raised by the voice mail messages, Defendant requested further medical documentation from Plaintiff to support his alleged medical condition, but the Plaintiff failed to respond to the Defendant's repeated request for additional medical information regarding specific concerns.  Exhibit 15, Letter of Feb. 9, 2004.  Plaintiff only sought to provide medical information to the agency's doctor after the Plaintiff was terminated from the leave

transfer program. Exhibit 16, Letter of Feb. 10, 2004. Therefore, the Defendant had legitimate and nondiscriminatory reasons for removing the Plaintiff from the leave transfer program.[7] Therefore, the Court should grant summary judgment in favor of the Defendant.

### D.    Proposed Removal

On March 4, 2004, the Defendant proposed the removal of the Plaintiff. At that time, it appeared that the Plaintiff was not a "qualified handicapped employee," that is, an employee that could do his job with an accommodation. <u>Chinchillo v. Powell</u>, 236 F. Supp.2d 18, 23 (D.D.C. 2003) (a disabled employee with a qualified handicap is one that "can otherwise perform the essential functions of the job with reasonable accommodation"). Plaintiff appeared unable or unwilling to do his job after his "injury" and the Defendant therefore legitimately proposed his removal.

First, according to the Defendant's doctor's report, the allegedly offending May 2003 email "which would ordinarily be of limited consequence for most people - had great impact on Plaintiff because of his emotional fragility and his previous traumatic experience." Exhibit 18, Allen Medical Report of March 1, 2004. 51. The email was so allegedly debilitating for the Plaintiff that he was never able to return to his work place.

Then, when an alternative work site was arranged for him, the Plaintiff was unable to enter the new building. Though he was eventually able, after repeated tries, to enter an alternative location for work, Plaintiff was not able to turn on the computer so he could not use his email. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003. Computers and emails are staples of the modern workplace. Despite the Defendant's attempts to accommodate him, the Plaintiff would not even call his supervisor by telephone regarding his absences and rejected a

---

[7]        In May 2004, the Defendant returned Plaintiff to the leave transfer program. Compl. ¶ 63.

federal express delivery to his house. Exhibit 11, Letter of Dec. 8, 2003 Documenting

Agreement between OIG and Pl.'s Counsel; Exhibit 14, Letter of Jan. 14, 2004; Exhibit 20,

Notice of Proposed Removal of March 8, 2004.

      The agency's doctor, after reviewing Plaintiff's medical information, recommended that

the agency allow the Plaintiff to work from home. Exhibit 18, Allen Medical Report of March 1,

2004. However, further efforts seemed futile given the attempts to accommodate that the

Defendant had already made: offsite location, attempt to communicate by telephone, attempt to

deliver packages to his house, part-time work, restructured job duties that would be less

stressful.[8] The Plaintiff appeared unable or unwilling to do virtually anything and neither the

agency's doctor nor the Plaintiff's doctor provided a basis for believing that the work-at-home

accommodation would be successful in the face of Plaintiff's inability or unwillingness to

cooperate. Exhibit 18, Allen Medical Report of March 1, 2004; Exhibit 12, Lewis Summary

Medical Report of Dec. 15, 2003. Furthermore, Plaintiff's voice mail messages seemed to

indicate that Plaintiff was trying to exploit the leave transfer program.[9]

---

[8]    Indeed, he had been advised that he "may be entitled to time off" under FMLA if he invoked such entitlement, but he was unable or unwilling to do that, and, consequently, his extended absences were carried as AWOL.   Exhibit 14, Letter of Jan. 14, 2004.

[9]    During the time frame that Plaintiff indicated that he was unable to return to his work place and use a computer, the Defendant was informed by an employee that the Plaintiff was starting a marriage counseling business and had recruited the employee to do some proof reading for him. Exhibit 28, Zelnick Email of Feb. 4, 2004. This information further suggested that the Plaintiff could communicate with others, but was unwilling to communicate effectively with the Defendant. Plaintiff refused to return a number of telephone calls to his supervisor, and even refused to accept delivery of a package to his house. Exhibit 11, Letter of Dec. 8, 2003 Documenting Agreement between OIG and Pl.'s Counsel; Exhibit 14, Letter of Jan. 14, 2004; Exhibit 20, Notice of Proposed Removal of March 8, 2004. Inexplicably, he was "well enough" to make repeated telephone calls to the agency to try to participate in the leave donor program (Exhibit 9, Letter of Nov. 21, 2003 with Voice Mail Transcripts), to solicit leave from co-workers (Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003), and even to invite a co-worker to join him in establishing a marriage counseling business (Exhibit 28, Zelnick Email of Feb. 4, 2004) – all the while purportedly being too sick to return phone calls to his supervisor.

Instead of removing the Plaintiff, the Defendant agreed to allow the Plaintiff to work-at-home from May 2004 until Feb 2005. In fact, this accommodation failed and ultimately even Plaintiff's own doctor conceded that Plaintiff could not do the job. Exhibit 23, Lewis Medical Report of March 7, 2005. The District of Columbia Circuit has recognized that attendance is an essential function of a government employee's position. See e.g. Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994) ("an essential function of any government job is an ability to appear for work"); Rosell v. Kelliher, 468 F. Supp.2d 39, 46 (D.D.C. 2006) ("One of the most fundamental requirements of any position" is the ability to appear for work.); Sampson v. Citibank, F.S.B., 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (an "employee who cannot meet the attendance requirements of a job is not a 'qualified' individual under the ADA") (citing Tyndall v. National Educ. Centers, 31 F.3d 209, 213 (4th Cir. 1994)). "[An employee with a] handicap which deprives a worker of an ability to fulfill an essential requirement of his craft can never be 'otherwise qualified' [under the Rehabilitation Act]." Matzo v. Postmaster General, 685 F. Supp. 260, 263 (D.D.C 1987), aff'd, 861 F.2d 1290 (D.C. Cir. 1988). Therefore, the Plaintiff indisputably was not "otherwise" qualified under the Rehabilitation Act.

Moreover, had the Plaintiff not taken a disability retirement, the Defendant would have been obligated to remove him because he had not completed the paperwork for his required security clearance, as Defendant had repeatedly requested. Exhibit 24, Letter of Nov. 16, 2004 from DHS Personnel Security Division Discontinuing Efforts to Process Pl.'s Top Secret Security Clearance; Exhibit 25, Finn Security Clearance Letter of Feb. 18, 2005.

Thus, the Defendant had legitimate and nondiscriminatory reasons for proposing the removal of the Plaintiff. Therefore, the Court should grant summary judgment in favor of the Defendant.

### E.    Wages from January to May 2004

The Plaintiff claims that the Defendant erroneously failed to pay him wages and benefits from January 26 to May 25, 2004. Compl. ¶ 64. Plaintiff had exhausted his leave and did not work from January through May 2004. Therefore, he was not entitled to any pay.

The Plaintiff suggests that because Defendant eventually agreed to allow Plaintiff to work at home, that the Defendant was obligated to do so as of January and therefore Plaintiff is entitled to back pay for the time period from January until May. As discussed above, Defendant was not obligated to allow Plaintiff to work from home and had even proposed his removal. (Notably the at-home accommodation failed). Allowing the Plaintiff to work at home and returning him to the leave transfer program was the Defendant's last ditch effort to save the Plaintiff's career, not an admission of error.

## IV.    Plaintiff's Disability Discrimination Claim Fails

### A.    Section 501 of the Rehabilitation Act

The Rehabilitation Act of 1973, 29 U.S.C.A. § 791, was passed to enhance the ability of disabled persons to work. The right to work of a person with disabilities is not unlimited. A person who is disabled must be "otherwise qualified" for a job in order to benefit from the protection afforded by the Rehabilitation Act. This means that the disabled person must have the ability–with or without accommodation–to perform the job at issue. In other words, a blind person may not be qualified to hold certain jobs that are dependent upon the ability to see. A deaf person may not be qualified to hold certain jobs that are dependent upon the ability to hear, and so on. Other limitations upon a disabled person's right to work are that, although the law imposes upon the federal government the duties of accommodation of people with disabilities into the workplace, the duty to accommodate is not inexhaustible. That is, the employer need only take reasonable measures to accommodate a disabled person into the workplace. In some

cases, in order to comply with the Rehabilitation Act, an employer need not provide the accommodation of choice to the employee, but may need only provide a different accommodation, or indeed, no accommodation at all.  See Aka v. Washington Hosp. Center, 156 F.3d 1284 (D.C. Cir. 1998) ("An employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation.") (citation omitted).

Discrimination claims brought under the Rehabilitation Act are analyzed under the McDonnell Douglas burden-shifting scheme established by the United States Supreme Court. See McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000).  In this respect, Plaintiff has the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination.  McDonnell Douglas v. Green, 411 U.S. 792, 804 (1973).  If the Plaintiff succeeds in proving a prima facie case, the burden shifts to the Agency to articulate some legitimate, nondiscriminatory reason for the employment action.  Id.  If the Agency proffers a legitimate, nondiscriminatory reason, the burden shifts to the Plaintiff to show that the employer's stated reason was pretext for discrimination.  Id.  To satisfy his burden, Plaintiff "must prove both that the defendant's reason is false, and that discrimination was the real reason" for the employment action taken against him.  Guerrero v. Univ. of District of Columbia, 251 F. Supp.2d 13, 26 (D.D.C. 2003).  The Plaintiff, however, "may not rest on mere speculation alone but must produce some objective evidence showing that defendant's proffered reasons are mere pretext."  See id. (emphasis in original).  At all times, the ultimate burden of persuasion remains with the Plaintiff.  McDonnell Douglas, 411 U.S. at 804.

To establish a prima facie case of failure to accommodate, Plaintiff must show:  (1) he is an individual with a disability within the meaning of the Act; (2) he can otherwise perform the

essential functions of the job with reasonable accommodation; and (3) the employer refused to make such an accommodation because of Plaintiff's handicap. See Chinchillo v. Powell, 236 F. Supp.2d 18, 23 (D.D.C. 2003); Scarborogh v. Natsios, 190 F. Supp.2d 5, 19 (D.D.C. 2002).[10] The standards contained in certain portions of the Americans with Disabilities Act of 1990 are used to determine whether the Rehabilitation Act has been violated. 29 U.S.C.A. § 793(d).

**B.    The Defendant reasonably accommodated the Plaintiff**

Despite allowing the Plaintiff to work-at-home for roughly nine months and granting him the opportunity to work at an alternative work site, the Plaintiff claims that the Defendant discriminated against him based on his disability. Compl. ¶¶ 36, 61. Plaintiff claims that he was injured on the job via an email he read on May 28, 2003. Compl. ¶ 27. From that date on, the Plaintiff never returned to his office. Exhibit 26, Supervisor's Statement for Disability Retirement Packet.

---

[10] The Rehabilitation Act provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be standards applied under . . . the Americans with Disabilities Act." 29 U.S.C. § 794(d).

*First Accommodation*

In late October 2003, the Defendant accommodated Plaintiff by allowing him to work reduced hours at an alternate work site. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003. Previously, in a letter dated September 24, 2003, Plaintiff's counsel requested that plaintiff be allowed to work from home, but the medical documentation at the time did not support this request. Because the Plaintiff requested not to return to his office location, the Defendant agreed to accommodate the Plaintiff by allowing him to work from a different building site and scheduled October 28, 2003 as his first day there. That day, Plaintiff came to the building with his nurse but did not enter it, claiming that he was unable to because of his condition. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003. He was next scheduled to return to the alternate work site on November 12, 2003 from 9 a.m. until 12 p.m. He did not arrive until 10 a.m., did not log on to his email, claiming that he could not because of his illness. He then left shortly thereafter without completing any work. In an effort to accommodate him, his supervisor decided that he could work on paperwork at the alternate work site, rather than doing work on the computer. Plaintiff agreed to this accommodation, and he was then scheduled to work at the alternate work site on November 17, 2003. On November 17, 2003, the Plaintiff did not report as directed. Exhibit 7, Supervisor's Memo to Record of Nov. 19, 2003. Moreover, the Plaintiff did not call his supervisor regarding his absences. Exhibit 11, Letter of Dec. 8, 2003 Documenting Agreement between OIG and Pl.'s Counsel; Exhibit 14, Letter of Jan. 14, 2004; Exhibit 20, Notice of Proposed Removal of March 8, 2004. In addition, the Defendant offered the Plaintiff the opportunity to report on an interim basis to a new supervisor (first Ms. Hendricks, at his request, and then Mr. Stulginsky upon Hendricks' retirement) and the restructuring of job duties so he would have less stress. Exhibit 19, Emails of March 2, 2004.

*Second Accommodation*

The Defendant ultimately allowed the Plaintiff to work from home for roughly nine months.  When the accommodation proved unsuccessful, Plaintiff's doctor advised him to discontinue working effective February 28, 2005.  Exhibit 23, Lewis Medical Report of March 7, 2005.  The Plaintiff signed his disability application on February 24, 2005 and it was approved in April 2005.  Exhibit 22, Letter of Feb. 28, 2005; Exhibit 27, Approval of Disability Retirement Application dated Apr. 13, 2005.

*Timing of Work-At-Home Accommodation was Granted within Reasonable Time*

The Plaintiff suggests that the Defendant did not reasonably accommodate him because he was allowed to work from home a year after his alleged work related injury.  Compl. ¶ 35.  Even if the Plaintiff could state a *prima facie case,* the Defendant had legitimate and nondiscriminatory reasons for the employment action.  Plaintiff alleges that he suffered a relapse of his PTSD on May 28, 2003 after he read an email and that the Defendant allowed him to work from home in May 26, 2004.  Compl. ¶ 35.  The Plaintiff neglects to state that his doctor approved his return to work effective September 29, 2003 and that he requested to work from home from that date based on his  "inability to return to the location where the stressor took place."  Exhibit __, September 24, 2003 letter from Plaintiff's Counsel.  Due to the Plaintiff's concern about returning to his office, the Defendant offered an alternative work site.

The Defendant first attempted to accommodate the Plaintiff with an alternative work site.  After the Plaintiff claimed that he was unable to work from an alternative work site, the Defendant sought sufficient supporting medical documentation and requested that the Plaintiff release his medical information to an agency doctor who would review the medical assessment.  Exhibit 14, Letter of Jan. 14, 2004.  Per Plaintiff's counsel's request dated February 10, 2004,

the Defendant redrafted an Authorization for Release of Medical Information to facilitate the review of the Plaintiff's doctor's records. Exhibit 17, Letter of Feb. 11, 2004. On March 1, 2004, after reviewing Plaintiff's medical records, the agency's doctor issued a report recommending that the Plaintiff work from home. Exhibit 18, Allen Medical Report of March 1, 2004.

Plaintiff admits that by May 26, 2004, the Defendant allowed the Plaintiff to work from home. Compl. ¶ 35. The Defendant, however, initially discounted the agency's doctor's recommendation due to a perceived failing to consider several factors indicating the Plaintiff's refusal to cooperate with management. Specifically, the Defendant was concerned that the agency's doctor had not considered:

- a copy of the offending email;
- a copy of the audio and written transcript of his telephone calls to Sholanda Smith;
- a copy of the email in which he apparently is soliciting another employee to assist him in establishing a marriage counseling business (Exhibit 28, Zelnick Email of Feb. 4, 2004);
- the fact that several employees have come forwarded to report that Daniels has called them (while he has been out of the office) asking them to donate leave to him;
- a description of agency efforts thus far to provide accommodations to Mr. Daniels, including establishment of a new offsite location at the Press Club building, offers for him to work part time over a period of several weeks, reporting on an interim basis to a new supervisor (first Ms. Hendricks, at his request, and then Mr. Stulginsky upon Hendricks' retirement); restructuring of job duties so he would have less stress;
- Daniels repeated refusals to accept federal express deliveries; [and]
- Daniels' repeated failures to call into his supervisor to report his absences

Exhibit 19, Emails of March 2, 2004. The Defendant noted that the agency's doctor did not examine the Plaintiff. Id. In fact, the agency's doctor relied in part on the Plaintiff's doctor who the agency's doctor stated "was under the impression that the employee had been in contact with

[Defendant] by telephone and did not know that the employee was not returning phone calls and was refusing mail." Exhibit 19, Emails of March 2, 2004. Further, the Defendant was concerned that "Mr. Daniels has been repeatedly contacting the payroll staff to determine the status of leave donations and has told them that he does not trust DHS management because they are out to get him. The Defendant concluded that "[w]ith that mind set, [Defendant] would be surprised if the accommodations suggested work." Exhibit 19, Emails of March 2, 2004

Despite these concerns, the Defendant ultimately permitted the Plaintiff to work from home for roughly nine months. Given these concerns, however, the Defendant was not obligated to have allowed the Plaintiff to work-at-home and the refusal to do so at this time was reasonable. Because the Defendant's stated reasons are legitimate and nondiscriminatory, the Court should grant summary judgment in favor of the Defendant.

> **C.    Plaintiff was not otherwise qualified for his position because at the time that he retired, he was incapable of performing his job.**

At the time of Plaintiff's retirement, he was incapable of continuing his work even though he had been working from home. Plaintiff's own doctor advised the Plaintiff not to return to work effective February 22, 2005. Exhibit 23, Lewis Medical Report of March 7, 2005. Plaintiff's doctor confirmed on March 7, 2005, that despite working from home, "accommodation has been unsuccessful" for the Plaintiff and that "[r]ecovery will be limited and maximum medical improvement cannot occur while Mr. Daniels remains on the job." Exhibit C, Lewis Medical Report of March 7, 2005, p. 2.

Furthermore, Plaintiff's job required Top Secret clearance and the Plaintiff never filled out the paperwork for the security clearance background investigation as Defendant had repeatedly requested. Exhibit 24, Letter of Nov. 16, 2004 from DHS Personnel Security

Division Discontinuing Efforts to Process Pl.'s Top Secret Security Clearance; Exhibit 25, Finn

Security Clearance Letter of Feb. 18, 2005.  Plaintiff's doctor, Dr. Lewis, confirmed that the

Plaintiff was unable to fill out his paperwork for the required security clearance.  Exhibit C,

Lewis Medical Report of March 7, 2005, p. 2.

### D.    Plaintiff's disability retirement was voluntary[11]

A plaintiff who advances a claim of constructive discharge must show "working

conditions so intolerable that a reasonable person would have felt compelled to resign."  Rhodes

v. Chertoff,  No. 04-1715, 2005 WL 3273566, at *6, fn 6. *quoting* Pa. State Police v. Suders, 542

U.S. 129, ---- (2004).  Thus, constructive discharge "can be regarded as an aggravated case of ...

hostile work environment."  Pa. State Police, at 146.  Discriminatory or retaliatory acts standing

alone seldom "give rise to a finding of constructive discharge–particularly in cases where the

discrimination or retaliation involves a discrete adverse employment action rather than pervasive

harassment."  Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 79 (D.D.C. 2006), *citing* Clark County

School Dist. v. Breeden, 532 U.S. 268, 273 (2001).

"Not only must plaintiff demonstrate that there was intentional discrimination, but

plaintiff must also establish the presence of 'aggravating factors.'"  Crenshaw v. Georgetown

Univ., 23 F. Supp.2d 11, 19 (D.D.C.1998) (*quoting* Dashnaw v. Pena, 12 F.3d 1112, 1115 (D.C.

Cir.1994)); see also Valles-Hall v. Center for Nonprofit Advancement, 481 F. Supp.2d 118

(D.D.C. 2007).  There must be 'aggravating factors,' such as continuous and pervasive

discriminatory treatment spanning a substantial period of time.  Lake v. Baker, 662 F. Supp. 392,

404 (D.D.C. 1987) (citations omitted); Ramsey v. Derwinski, 787 F. Supp. 8, 10 (D.D.C. 1992).

Even if personnel decisions are "career-harming" they are not likely to lead to a finding of

---

[11]    As discussed above, Plaintiff did not exhaust a constructive discharge claim.

constructive discharge unless they are also "career-ending." Kalinoski, 435 F. Supp. 2d at 80.

An employee who resigns and who alleges the resignation was not voluntary has the burden of

establishing that the resignation was involuntary. Christie v. United States, 518 F.2d 584, 587

(Ct. Cl. 1975.). An actionable claim of constructive discharge requires a showing that (1)

intentional discrimination existed, (2) the employer deliberately made working conditions

intolerable, and (3) aggravating factors justified the plaintiff's conclusion that he had no option

but to end his employment. See Sisay v. Greyhound Lines, Inc., 34 F. Supp.2d 59, 65 (D.D.C.

1998); see also Bishopp v. District of Columbia, 788 F.2d 781, 790 (D.C. Cir. 1986)).

 Here, Plaintiff does not make out even a *prima facie* case of constructive discharge in the

complaint. He does not allege that conditions were so intolerable that he was forced to resign or

that there were aggravating factors that justified the conclusion that the Plaintiff had no options.

To the contrary, the Defendant made significant efforts to accommodate the Plaintiff. In fact,

when the Plaintiff choose to take disability retirement, he was still working from home under the

conditions of his disability accommodation. The Plaintiff had been given work-at-home

accommodation for roughly nine months prior to his request for disability retirement dated

February 24, 2005. See Exhibit 33, 2005 Work Stub

 More importantly, Plaintiff's doctor, Dr. Lewis advised the Plaintiff not to return to work

effective February 22, 2005. Exhibit 23, Lewis Medical Report of March 7, 2005. Plaintiff's

doctor confirmed on March 7, 2005, that despite working from home, "accommodation has been

unsuccessful" for the Plaintiff and that "[r]ecovery will be limited and maximum medical

improvement cannot occur while Mr. Daniels remains on the job." Exhibit 23, Lewis Medical

Report of March 7, 2005. Plaintiff voluntarily signed his application for disability retirement on

February 24, 2007.  Exhibit 22, Letter of Feb. 28, 2005.[12]  Apparently, Plaintiff's medical

condition was not improving and the Plaintiff therefore chose disability retirement.  That was

certainly a choice that Plaintiff was entitled to make and not a basis for a constructive discharge

claim.

       About one week prior to Plaintiff's signed request for disability retirement, the Defendant

yet again reminded the Plaintiff to fill out the required paperwork for Top Secret Security

clearance background investigation.  In a letter dated February 18, 2005, the Defendant noted

that the Defendant already had made numerous attempts over a six to nine month period to

obtain the required paperwork from him, but that the Plaintiff had failed to produce the required

forms and that failure to submit the paperwork by March 4, 2005 could result in disciplinary

action up to and including removal.  Exhibit 25, Finn Security Clearance Letter of Feb. 18, 2005.

Furthermore, Plaintiff's doctor, Dr. Lewis, confirmed that the Plaintiff was unable to fill out his

paperwork for clearance.  Exhibit 23, Lewis Medical Report of March 7, 2005.  Requiring that

Plaintiff have Top Secret Security clearance was not retaliation or a deliberate imposition of

intolerable conditions to drive Plaintiff into an involuntary quit.  See Roberts v. Segal Company,

125 F. Supp.2d 545, 550 (D.D.C. 2000).  Rather, Plaintiff's job required Top Secret clearance.

See Exhibit B, February 18, 2005 Letter.  Plaintiff chose to retire to seek disability retirement

because he was allegedly  no longer able to work due to his PTSD.

---

      [12]    Moreover, the Plaintiff was apparently counseled by his attorney regarding his
disability retirement as he had his attorney forward the application for disability retirement to the
Defendant.  Exhibit 22, Letter of Feb. 28, 2005.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed or summary judgment should be entered.


January 15, 2008                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
ANDREA McBARNETTE, D.C. Bar  # 483789
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7153

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion to Dismiss or in the Alternative for Summary Judgment was  filed via the Court's electronic filing system on this January 14, 2008 and is expected to be served upon Plaintiff by first class mail postage prepaid to:


Demetri J. Daniels, Pro Se
5208 Martinique Lane
Alexandria, VA 22315



_____

ANDREA McBARNETTE
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7153

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMETRI J. DANIELS                          )
                                            )
                        Plaintiff,          )
                                            )        Civil Action No. 07-0505 (RBW)
            v.                              )
                                            )
MICHAEL CHERTOFF, Secretary,                )
U.S. Department of Homeland Security        )
                                            )
                        Defendants.         )
_____)

**ORDER**

UPON CONSIDERATION of Defendant's dispositive motion, the memorandum of

points and authorities in support thereof, any opposition thereto, any reply, and the record herein,

it is hereby ORDERED that the motion is GRANTED.

SO ORDERED, on this _____ day of _____, 2008.

_____
United States District Court Judge